

EXHIBIT

B-1

471-04505-2023

Filed: 8/14/2023 10:22 AM
Michael Gould
District Clerk
Collin County, Texas
By Amy Mathis Deputy
Envelope ID: 78485539

NO. _____

| | |
|---|---|
| **KRISHNENDU DASGUPTA,** | **IN THE DISTRICT COURT** |
| *Plaintiff,* | |
| **v.** | **COLLIN COUNTY, TEXAS** |
| **BECKETT COLLECTIBLES, LLC** | **____ JUDICIAL DISTRICT** |
| *Defendant.* | |
| | **JURY TRIAL DEMANDED** |

---

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Krishnendu Dasgupta ("Plaintiff" or "Krish") complaining of Beckett Collectibles, LLC ("Defendant" or "Beckett") and files this Plaintiff's Original Petition. For causes of action, Plaintiff respectfully shows:

### I.

### PARTIES, CLAIMS FOR RELIEF AND SERVICE

a.   Discovery is intended to be conducted under Level Two of TRCP 190.

b.   Damages sought are within the jurisdictional limits of the Court.  Plaintiff seeks monetary relief over $1,000,000.   The maximum amount claimed is $2,000,000.

c.   Plaintiff is an individual, a resident and citizen of the State of Connecticut who can be contacted in care of his undersigned counsel of record.

d.   Beckett Collectibles, LLC, is a foreign limited liability company that is located at 2700 Summit Avenue, Suite 100, Plano, Texas 75074 doing business in the State of Texas. The Defendant may be served with process by serving its registered agent at Corporation Service Company dba CSC, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

---

## II.

### JURISDICTION AND VENUE

2.01    The Court has jurisdiction over this matter because the amount in controversy is within the jurisdictional limits of the Court. The Court has venue over Defendant conducted substantial business in Collin County, Texas.

## III.

### REQUEST FOR DISCLOSURE

3.02    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendant has been requested to disclose, to Plaintiff, within 50 days of the service of this Request, the information or material described in Rule 194.2(a) - (k).

## IV.

### BACKGROUND FACTS

4.01    Plaintiff has an employment history of being VP of Data with ESPN and before that a long history at Disney. In May 2021 Plaintiff met Scott Roskind, Founder and CEO of Noxx through an associate. Plaintiff was hired as Chief Technology Officer ("CTO") of Noxx with a salary of $125,000 per year.

4.02    In December 2021 Noxx was considered for acquisition by Defendant Beckett Collectibles, LLC. At that time, Noxx went through a technical due diligence review performed by Defendant's consultants.

4.03    In February 2022 Defendant completed their due diligence and decided they would like to purchase Noxx. An Intent to Purchase was agreed to.

4.04    In March 2022 Defendant came up with a set of milestones. The milestones were set before Noxx had any look at the current Beckett software architecture. Noxx was not allowed to

get any details until the real closing. So, Noxx added a statement that said milestones are subject to agreed and reasonable changes.

4.05    In August 2022 Beckett finally indicated that the deal would go through. At this point, Noxx had wasted five (5) months in a holding pattern, with no details from Beckett.

4.06    In September 2022 Beckett finally bought Noxx. Plaintiff was hired as Head of Engineering at Beckett with a salary of $250,000 per year. Plaintiff entered into an Employment Agreement effective as of March 24, 2022, a copy of which is attached as **Exhibit A** hereto and incorporated herein by reference. Plaintiff reported to Kunal Chopra, CEO of Beckett. Plaintiff did a deep dive to lay out a plan for integrating the software systems 4-6 month integration plan. The plan was at this time Beckett CTO was Chris Batista (contractor from a consulting company PlainSpoken). He and Plaintiff agreed that to shortcut getting Noxx live, they would use the Noxx system for data, only integrating the "new PlainSpoken Data Platform" from Beckett.

4.07    In October 2022 the PlainSpoken Data Platform was analyzed for use by Plaintiff. Plaintiff learned that no one has integrated its use to date, and that they were running on a $2 million a year software package that was recommended by a board member's former company. Normal standard data platforms (Facebook, Twitter, Netflix, Google, AWS) use normal open source data platforms (as Noxx was on). It was apparent that integrating this crazy platform was going to take some time. Since Plaintiff and his team would be the only team using the data platform, Plaintiff had to do lots of debugging and back and forth. (worth noting, after Plaintiff left, they terminated their new data platform that they spent $2 million on, which Plaintiff had recommended all along).

4.08    In October 2022 Plaintiff and his team had a meeting in Dallas to announce the new structure. Plaintiff was part of the Senior Leadership Team. Previous to this meeting, Plaintiff

was asked by the CEO (Kunal Chopra) to create on paper the ideal technical organization and function. Plaintiff did that. It was never commented on except by the head of product, Justin Richmond ("Justin"). He was a contractor with no Digital Product leadership experience. He was friends with the Board member who had recommended the bad data platform. He also worked at the data platform company. Justin sent Plaintiff an email regarding Plaintiff's organization and structure updates telling Plaintiff to "STAND DOWN." It was aggressive and odd so Plaintiff shared it with Defendant's CEO, Kunal Chopra.

4.09   In October 2022 Defendant had a meeting in Dallas, Texas.  On the morning of the meeting, Plaintiff left his hotel room and went downstairs, in pajamas, to get coffee and a light breakfast before showering. As Plaintiff got his coffee, Justin was sitting eating breakfast. He beckoned Plaintiff to his table, rudely, and Plaintiff sat down. The following conversation took place: "Hey Justin, what's up - just grabbing a coffee". Justin : "You don't like me very much, do you? " Krish: "Well, whatever differences we have had, let's start fresh and try again." Justin : "You don't really mean that." Krish: "Uhmmm, I'm good, going back to my room." Justin: "Krish, no one likes you here. Even Kunal doesn't have your back." Krish: "I doubt that Justin. I have lots of support and many people telling me I'm exactly what Beckett needs." Justin pulls out his phone, at 7am "Let me call Kunal and ask him." Justin waves his phone in my face. Krish: "No, don't do that. That's nuts." At this point Plaintiff got up and walked back to the elevators.   Justin :" Are you walking away from me?"

4.10    Plaintiff returned to his room, shaken, and considering just going back home to Connecticut.  Plaintiff went through a long text conversation with the Beckett CEO Kunal and Scott, (now Head of Marketing at Beckett) saying, "hey - you know what, I might be better off just being an engineer and not being in the leadership group.   I really don't want constant conflict."

Plaintiff talked to HR that morning and got "Oh Justin is a big teddy bear (Beckett HR were laughing)." Krish: "Uhmm, I didn't see that and frankly felt threatened physically." Beckett HR "Oh, he' a great guy" [Beckett HR said this same thing to one of Plaintiff's employees when they went to HR about a similar person to Justin, laughed it off] [Justin was fired weeks after Plaintiff was let go, Kunal was fired a couple weeks later, the HR person Plaintiff talked to was fired weeks after that]

4.11     So at the "ALL" Hands meeting, Kunal put up the organizational chart, but with no names filled in. Plaintiff asked, "I think we would all like to know who reports to whom" (Crowd agrees).   Kunal "Krish, we need to be a team, a team everyone knows what they need to do." Plaintiff, "Ok". And that was that. Plaintiff was hardly being difficult.

4.12     In November 2022, Plaintiff was told that the team that supports the data of the expensive, "PlainSpoken Data Platform" was being let go on December 11, 2022. Plaintiff's team still had things that needed to be done, so Plaintiff's team prioritized them to make sure things got done.

4.13     In December 2022  Plaintiff's team was left using the new data system on their own, being told by the person that was put in charge of it (not Plaintiff, for whatever reason, and he was a contractor at Beckett) that, "The contractor won't be able to help us for some time." At this point, Plaintiff's team created some of their own data endpoints in that system to accomplish both their Beckett needs and milestone needs.

4.14     In December 2022 Plaintiff and his team were working feverishly (60-70 hour weeks) to get their product integrated with the new data and on the Beckett platform.  Plaintiff's team had only been part of Beckett for 90 days, but had already done an amazing amount of work trying to fix things that were Beckett problems.

4.15    In January 2023 Dave LeBlanc, Head of HR and Julie R. called and informed Plaintiff that he was being terminated. This was an extreme shock to Plaintiff and other executives. Plaintiff asked for a reason. They said that they would send Plaintiff an email with reasoning in the termination letter, but no cause was alleged in the letter.

## V.

### FIRST COUNT
### BREACH OF CONTRACT

5.01    The foregoing paragraphs of this Petition are incorporated in this Count by reference as fully as if set forth at length herein.

5.02    Plaintiff fully performed his contract with Defendant, attached as **Exhibit A** hereto and incorporated herein by reference, but Defendant has materially breached Plaintiff's contracts by failing to pay Plaintiff his severance as provided in the contract.

5.03    As a result of such breaches, Plaintiff has suffered damages, all of which were reasonably foreseeable, including sums due as set forth below and other direct, indirect, incidental and consequential damages, both pre-termination and post-termination, for which Plaintiff sues:

5.04    Plaintiff has fully performed his contract obligations, thereby taking his employment contract outside of the parol evidence rule.

5.05    Although Plaintiff has demanded payment of Plaintiff's damages, Defendants have failed and refused to pay same. Therefore, Defendants are liable to Plaintiff for Plaintiff's reasonable and necessary attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, *et seq.* for which Plaintiff sues.

## VI.

### SECOND COUNT

### QUANTUM MERUIT/UNJUST ENRICHMENT

6.01    Plaintiff incorporates the foregoing paragraphs as though set forth herein verbatim.

6.02    In the alternative, if for any reason Plaintiff's employment contract is not enforceable then Defendant is liable to Plaintiff for unjust enrichment. Plaintiff rendered valuable services to Defendant by participating in management of Defendant's business on a global basis, the benefits of which were accepted by Defendant. Plaintiff rendered management services with an understanding and expectation that Plaintiff would be compensated for his services as agreed. Defendants have accepted and retained the benefits of Plaintiff's efforts by receiving and retaining substantial revenues. In the alternative to Plaintiff's breach of contract allegations, Plaintiff is entitled to recover the reasonable value of his management services rendered to Defendants.

6.03    Plaintiff has made written demand, so that pursuant to §38.001 et seq. of the Texas Civil Practice & Remedies Code, Plaintiff is entitled to recover his reasonable and necessary attorneys' fees.

## VII.

### JURY DEMAND

7.01    PLAINTIFF DEMANDS A TRIAL BY JURY.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover the following relief against Defendant for:

1.    Damages for breaches of contract, including actual damages, consequential damages, direct damages, indirect damages, incidental damages, and other damages allowed by law;

2.    Plaintiff's attorney's fees;

3.    Prejudgment and post-judgment interest at the maximum amount allowed by law;

4.    All costs of Court; and

5.    Such other and further relief to which Plaintiff may be justly entitled.

Dated this 14th day of August, 2023.

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By *W. D. Masterson*

W. D. Masterson
SBN 13184000
wdm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099 - Telephone
(214) 953-0133 – Fax

**ATTORNEYS FOR PLAINTIFF**
**KRISHNENDU DASGUPTA**

**Plaintiff's Exhibit**

**A**

## EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (this "Agreement") is made as of March 24, 2022, by and among Beckett Collectibles, LLC (the "Company") and Krish Dasgupta (the "Executive"). The Company and the Executive are sometimes hereinafter referred to individually as a "Party" and together as "Parties."

**WHEREAS**, on or about the date hereof, Noxx Holdings, Inc., a Delaware corporation and subsidiary of the Company, entered into a Stock Purchase Agreement to acquire Noxx Technologies, Inc. (the "Purchase Agreement");

**WHEREAS**, Executive is a party to the Purchase Agreement and has substantial business knowledge and expertise in the conduct of the Business (as defined in Section 12) and the Company desires to retain the knowledge, expertise and experience of the Executive to assist in the operations and management of the Company;

**WHEREAS**, the Executive acknowledges that the Company expends substantial resources establishing long term relationships with its customers and clients and that the Executive will from time to time during the course of the Executive's employment be exposed to such customers and clients and prospective customers and clients;

**WHEREAS**, the Executive acknowledges that in connection with the Executive's employment the Executive will have access to valuable Confidential Information (as defined in Section 6) including, but not limited to, the Company's methods of doing business, business plans and trade secrets;

**WHEREAS**, the Company desires that the Executive not directly or indirectly compete with the Company for a reasonable period of time following the separation of his employment to protect the Company's business interests; and

**WHEREAS**, all of the foregoing recitals are incorporated into the covenants of this Agreement as if set forth herein at length.

**NOW THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Employment; Term. The Company will employ the Executive, and the Executive hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement, beginning on the Closing Date (as defined in the Purchase Agreement) and continuing until the three-year anniversary of the Closing Date (the "Employment Period"), unless terminated sooner in accordance with Paragraph 5; notwithstanding the foregoing, in the event the Purchase Agreement is terminated in accordance with its terms, this Agreement shall automatically terminate and become *void ab initio*. If Employee continues to be employed by the Company after the expiration of the Employment Period but the Employment Period is not extended by mutual agreement, then Employee will thereafter be an at-will employee of the Company and the

employment of Employee by the Company thereafter will not be governed by the terms of this Employment Agreement.

2.   Position and Duties.

(a)   During the Employment Period, the Executive will serve as the Engineering Lead of the Company, or such title as may otherwise be agreed upon, and will have duties, responsibilities and authority commensurate with such position, subject to the power of the Company's Board of Directors (the "Board") to expand or limit such duties, responsibilities and authority, including the right to give the Executive similar responsibilities with respect to any subsidiaries or affiliates of the Company (any such subsidiaries or affiliates designated by the Company, together with the Company, the "Company Group") and to require the Executive at any time and from time to time to carry out such special projects or functions commensurate with his capacity and abilities as the Board may in its discretion assign; provided, however, in all events, unless and until the software developments detailed on Schedule 2(a) hereto (the "Milestones") have been completed, the substantial majority of the Executive's work effort and time will be dedicated to the completion of the Milestones.

(b)   During the Employment Period, the Executive will report to the acting Chief Executive Officer of BKX Holdings, LLC and the Executive will devote his best efforts and full business time and attention to the business and affairs of the Company Group and to the performance of such duties as may be assigned to the Executive from time to time by the Company. The Executive will act in the best interest of the Company Group and, except as may be specifically permitted by the Company, will not engage in any other business or other activity that may, individually or in the aggregate, interfere with the performance of Executive's duties, responsibilities and obligations under this Agreement or otherwise, or create an actual or potential business or fiduciary conflict. The Executive will perform the Executive's duties, responsibilities and functions on behalf of the Company Group hereunder to the best of the Executive's abilities in a diligent, trustworthy, businesslike and efficient manner.

3.   Compensation.

(a)   During the Employment Period, the Executive's base salary ("Base Salary") will be $250,000 per fiscal year, subject to review on an annual basis and upward adjustment by the Board in its sole and absolute discretion.  The Executive's Base Salary will be paid by the Company in regular installments in accordance with its general payroll practices.

(b)   During the Employment Period, Executive shall be eligible to receive an annual performance-based bonus equal to up to 50% of the Base Salary for the applicable fiscal year (an "Annual Bonus"), in an amount and subject to terms and conditions determined by the Board in its sole and absolute discretion for each fiscal year, based on milestones to be mutually agreed by the Board and the Executive on an annual basis. Except as contemplated by Section 5(c), if an Annual Bonus is awarded, Executive shall not be entitled to receive any such Annual Bonus unless the Employment Period is in effect, and the Executive has not provided notice to terminate the Employment Period, as of the last day of the Company's fiscal year to which such Annual Bonus relates.  The Annual Bonus (if any) shall be paid within 30 days following the date the Company receives its final audited financial statements for the fiscal year to which such Annual Bonus relates, but in no event more than one-hundred and 120 days following the last day of such fiscal year.

(c)     Executive shall be eligible to participate in any long-term equity incentive plan established by the Company.

(d)     All compensation paid to the Executive under this Agreement shall be subject to applicable withholdings and deductions as required by law or as authorized by the Executive.

4.     Benefits.  In addition to the Base Salary and Annual Bonus, the Executive will be eligible for the following benefits during the Employment Period:

(a)     During the Employment Period, the Executive shall be eligible to participate in or receive benefits under all of the Company's Employee Benefit Plans as the Company may adopt or maintain from time to time generally for all or most of its executives of the same status within the hierarchy of the Company.  As used herein, the term "Employee Benefit Plan" means any pension and retirement plan; supplemental pension, retirement and deferred compensation plan; savings and profit-sharing plan; life insurance plan; medical insurance plan; dental insurance plan; disability plan; and health and accident plan or arrangement, any of which may be changed or eliminated by the Company (subject to the applicable plan, arrangement or law). Such participation shall be subject to the terms, conditions and overall administration of such plan or arrangement.  Nothing contained in this Agreement shall be construed to create any obligation on the part of the Company to establish or maintain the effectiveness of any such plan, program or benefit which may be in effect from time to time.

(b)     The Company will reimburse the Executive for all reasonable and documented expenses incurred by the Executive during the Employment Period in connection with the performance of the Executive's duties and responsibilities under this Agreement, in accordance with the Company's policies and procedures in effect from time to time with respect to travel, entertainment and other business expenses.

5.     Termination.

(a)     Notwithstanding Section 1, the Executive's employment with the Company will end upon the earliest of (i) the Executive's death or mental or physical disability or incapacity (as determined by a physician selected by the Company in its good faith judgment), (ii) the Executive's voluntary resignation without Good Reason, or (iii) the Executive's termination by the Company at any time with or without Cause (as defined in Section 5(f)). Except for termination by reason of the Executive's death, any termination of the Executive's employment by either Party shall be communicated by Notice of Termination to the other Party.  For purposes of this Agreement, a "Notice of Termination" shall mean a written notice that shall indicate the specific termination provision in this Agreement relied upon.

(b)     If the Executive's employment with the Company is terminated for any reason, the Company shall pay or provide to the Executive (or to the Executive's authorized representative or estate): (i) any Base Salary earned through the date of termination; (ii) unpaid expense reimbursements (subject to, and in accordance with, Sections 4(b) and 4(c)); (iii) statutory entitlements as may be required to be paid under the applicable law; and (iv) any vested benefits the Executive may have under any Employee Benefit Plan through the date of termination, which vested benefits shall be paid and/or provided in accordance with the terms of such Employee Benefit Plan (collectively, the "Accrued Benefits").  Except as otherwise expressly provided

-3-

herein, all of the Executive's rights to salary, bonuses, fringe benefits and other compensation hereunder or under any policy or program of the Company that accrue or become payable on or after the termination of the Employment Period will cease upon such termination other than those expressly required under applicable law or other agreements between the Parties or which applicable law provides cannot cease upon termination.

(c)    In the event the Company terminates the Executive's employment without Cause or the Executive resigns for Good Reason prior to the conclusion of the Employment Period, then, in addition to the Accrued Benefits, subject to the Executive executing a separation agreement and general release in favor of the Company in a form provided by or reasonably acceptable to the Company, which shall include mutual non-disparagement and mutual confidentiality provisions (the "Release"), the Executive will be entitled to receive a severance payment (the "Severance Amount") equal to the then-current Base Salary for the period from the date of such termination or resignation through 12 months following such date to be paid within 30 days following Executive's execution and non-revocation of the Release and revocation period, which shall not be executed prior to the last day of the Employment Period.

(d)    In the event the Executive's employment is terminated by the Executive without Good Reason, such termination shall be effective sixty days after the date on which the Executive gives written Notice of Termination to the Company; provided that the Company may in its sole discretion accelerate the date of termination to any earlier effective date and such accelerated termination shall not result in or be treated as a termination by the Company for purposes of this Agreement.

(e)    For purposes of this Agreement, "Cause" means: (i) misconduct by or at the direction of the Executive that is materially injurious (monetarily or otherwise) to the Company; (ii) the commission by the Executive of, or an admission of guilt or plea of *nolo contendere* to, (A) any felony or (B) any misdemeanor involving moral turpitude, deceit, dishonesty or fraud; (iii) any act by the Executive involving fraud, embezzlement, theft or intentional misrepresentation in connection with the Executive's duties or in the course of the Executive's employment with the Company; (iv) any conduct by or at the direction of the Executive constituting a breach of the Executive's duty of loyalty or other fiduciary duty owing to the Company or any of its subsidiaries or affiliates (including, without limitation, engaging in any transaction that represents, directly or indirectly, self-dealing with the Company which has not been approved by a majority of the disinterested directors of the Board and as may be required under applicable laws); (v) any willful, intentional and material continued failure by the Executive to perform the Executive's material, ordinary and customary duties as an employee of the Company hereunder or any lawful directive of the Board, a material breach by the Executive of any provision of this Agreement or any other agreement between the Parties or an intentional and material violation by the Executive of any of the Company's written employment policies, in each such case, which has continued for more than twenty days following written notice of such non-performance from the Company and an opportunity to cure such purported non-performance during such 20-day notice period; or (vi) the Executive's willful failure to cooperate with a bona fide internal investigation or an investigation by regulatory or law enforcement authorities, after being instructed by the Company to cooperate, or the willful destruction or failure to preserve documents or other materials known to be relevant to such investigation or the inducement of others to fail to cooperate or to produce documents or other materials in connection with such investigation.

(f)     For purposes of this Agreement, "Good Reason" means in each case without the prior written consent of the Executive: (i) a material diminution in Base Salary of more than 10%, other than for Cause or in connection with an across-the-board reduction in compensation for all management team members of the Company under extraordinary circumstances as determined by the Board; (ii) a material diminution in duties, responsibilities or authority or an adverse change in title, other than for Cause; (iii) a material breach by the Company of a material term of this Agreement; or (iv) a requirement that the Executive relocate more than twenty-five miles further away from his current office.

6.     Confidential Information.

(a)     The Executive recognizes and acknowledges that the continued success of the Company depends upon the use and protection of a large body of confidential and proprietary information and that the Executive will have access to certain Confidential Information of the Company and Persons with which the Company does business, and that such Confidential Information constitutes valuable, special and unique property of the Company and its subsidiaries and affiliates and such other Persons. "Confidential Information" will be interpreted to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (i) related to the Company's and its subsidiaries' and affiliates' (including their respective predecessors) current or potential business and (ii) not generally or publicly known. Confidential Information includes, without limitation, the information, observations and data obtained by the Executive while employed by the Company (or any of its predecessors) concerning the business or affairs of the Company, including information concerning acquisition opportunities in or reasonably related to the Company's business or industry, the identities of the current, former or prospective employees, suppliers and customers of the Company, development, transition and transformation plans, methodologies and methods of doing business, strategic, marketing and expansion plans, financial and business plans, financial data, pricing information, employee lists and telephone numbers, locations of sales representatives, new and existing customer or supplier programs and services, customer terms, customer service and integration processes, requirements and costs of providing service, support and equipment. For purposes of this Agreement, Confidential Information shall not include information that (1) was otherwise in the Executive's possession prior to disclosure by the Company (whether prior to this Agreement as a result of association with the Company or during the Employment Period) as evidenced by the Executive's written records; (2) is disclosed to the Executive by a third party who is lawfully in possession of such information and who is not in violation of any contractual, legal or fiduciary obligation to the Company with respect to such information; or (3) is or becomes part of the public domain other than, directly or indirectly, through the breach of this Agreement. The Executive agrees that the Executive will use the Confidential Information only as necessary and only in connection with the performance of the Executive's duties hereunder. The Executive agrees that the Executive will not disclose to any unauthorized Person or use for the Executive's own or any other purposes (except as described in the immediately preceding sentence) any Confidential Information without the prior written consent of the Board.

(b)     The Executive understands that the Company will receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty to maintain the confidentiality of such information and to use it only for certain limited purposes. During the Employment Period and thereafter, and without in any way limiting the foregoing provisions of this Section 6, Executive will use the Third Party Information only as necessary and only in connection with the performance of the Executive's duties hereunder.

-5-

(c)     Notwithstanding the foregoing, nothing in this <u>Section 6</u> or any other section of this Agreement prohibits the Executive from providing truthful information or testimony if ordered by a court of competent jurisdiction to disclose Confidential Information, provided that in such circumstance the Executive must first provide prompt written notice of such order to the Company to enable the Company to seek a protective order prior to making such disclosure of Confidential Information.

7.     <u>Return of Company Property</u>.  The Executive acknowledges and agrees that all notes, records, reports, sketches, plans, unpublished memoranda or other documents, whether in paper, electronic or other form (and all copies thereof), held by the Executive concerning any information relating to the business of the Company, whether confidential or not, are the property of the Company.  The Executive will deliver to the Company (or delete or otherwise destroy, if so requested by the Company) at the termination or expiration of the Employment Period, or at any other time the Company may request, all equipment, files, property, memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and all electronic, paper or other copies thereof) belonging to the Company which include, but are not limited to, any materials that contain, embody or relate to the Confidential Information, Developments (as defined in <u>Section 8(b)</u>) or the business of the Company, which the Executive may then possess or have under the Executive's control.  The Executive will take any and all actions reasonably required by the Company from time to time in its sole discretion to ensure the continued confidentiality and protection of the Confidential Information at the cost and expense of the Company.  The Executive will notify the Company promptly and in writing of any circumstances of which the Executive has knowledge relating to any possession or use of any Confidential Information by any Person other than those authorized by the terms of this Agreement.  Upon request by the Company, the Executive shall furnish a written certification of the Executive's compliance with the Executive's obligations under this <u>Section 7</u>.

8.     <u>Intellectual Property Rights</u>.  The Executive and the Company agree that the Executive may make inventions or create original works of authorship, or create other Intellectual Property (as defined below) in the course of the Executive's duties and agree that in this respect the Executive has a special responsibility to further the interests of the Company.

(a)     For purposes of this Agreement, the term "<u>Intellectual Property Rights</u>" shall include, without limitation: all patents, registered designs, trademarks and service marks and the goodwill associated therewith (whether registered or not and including all applications for the foregoing), copyrights, design rights, database rights and all other intellectual property and similar proprietary rights subsisting in any part of the world (whether or not capable of registration) and the right to apply for registration or protection of any of them and in existing applications for the protection of any of the above . For purposes of this Agreement, the term "<u>Developments</u>" means all inventions (whether or not reduced to practice), improvements, discoveries, designs, processes, techniques, processes, prototypes, computer software (in any form, including, but not limited to, source code, object code, executable code, or the like), algorithms, database structures, data, information, works of authorship, derivative works, trademark, service mark, trade name or get-up, confidential information, all of the foregoing made, created or discovered by the Executive during and in the course of the Executive's employment or engagement with the Company, in conjunction with or in any way affecting or relating to the business of the Company, or capable of being used or adapted for use in or in connection with such business.

(b)    The Executive shall disclose all Developments immediately to the Company upon creation. The parties agree that all Developments, and Intellectual Property Rights therein, shall, to the fullest extent permitted by applicable law, belong to and be the absolute property of the Company. The Executive agrees to and does hereby irrevocably and unconditionally assign, transfer, and convey to the Company all right, title, and interest in and to all Developments and all Intellectual Property Rights therein, all absolutely for the full term of those rights. If, in the course of the Executive's employment with the Company, the Executive incorporates any Developments that the Executive has, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of the Executive's employment with the Company that the Executive considers, in whole or in part, directly or indirectly, to be his property ("Prior Invention") into a Company product, process or machine or other work done for the Company ("Company-Related Developments"), the Executive agrees to and does hereby grant to the Company a nonexclusive, royalty-free, paid up, irrevocable, perpetual, transferrable, worldwide right and license (with the full right to sublicense) to make, have made, modify, use, sell, offer for sale, and import such Prior Invention. Notwithstanding the foregoing, the Executive will not incorporate, or permit to be incorporated, Prior Inventions in any Company-Related Development without the Company's prior written consent. Notwithstanding the foregoing, nothing in this Agreement shall be construed to obligate the Executive to assign to the Company any Development which, in the sole judgment of the Company, reasonably exercised, is developed entirely on the Executive's own time and does not relate to the business efforts or research and development efforts in which, during the period of the Executive's employment, the Company actually is engaged or reasonably would be engaged, and does not result from the use of premises or equipment owned or leased by the Company; provided, however, that the Executive agrees that the Executive shall promptly disclose to the Company any such Developments for the purpose of determining whether they qualify for such exclusion. The Executive understands that, to the extent this Agreement is required to be construed in accordance with applicable laws which preclude a requirement in an employee agreement to assign certain classes of inventions made by an employee, this Section 8(b) will be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes.

(c)    If and whenever required by the Company, the Executive shall at the expense of the Company:

(i)    Apply or join with the Company in applying for patent or other protection or registration in any part of the world for any Intellectual Property Rights; and

(ii)    Execute all instruments and do all things necessary for vesting all Intellectual Property Rights (including inventorship, authorship, and/or ownership in any such inventions, works of authorship, or the like, and all patent, copyright, or other protection and applications and registrations) and all right, title and interest to and in them absolutely, with full title guarantee and as sole beneficial owner, in the Company or in such other Person as the Company may specify.

(d)    The Executive irrevocably and unconditionally waives all rights under any applicable law respecting copyright, in connection with the Executive's authorship of any existing or future copyright work in the course of the employment, in whatever part of the world such rights may be enforceable. To the extent moral rights or other rights related to paternity, integrity, disclosure and withdrawal (collectively, "Moral Rights") may not be assignable under applicable law and to the extent the following is allowed by the laws in the various countries where Moral

Rights exist, the Executive hereby irrevocably waives such Moral Rights and consents to any action of the Company that would violate such Moral Rights in the absence of such consent.

(e)    The Executive hereby unconditionally and irrevocably grants an irrevocable, perpetual, limited power of attorney, being coupled with an interest, to the Company's then-current CEO (or President) and Company representatives (other, if applicable, than the Executive), and their respective designees, to be the Executive's attorney in the Executive's name and on the Executive's behalf: (i) to execute any such instrument or do any such thing and generally to use the Executive's name for the limited purpose of giving to the Company the full benefits of this Section 8, without any requirement for further notice or consideration; (ii) to ensure that the ownership of any Developments and Company-Related Developments vests in the Company; and, (iii) for the purposes of seeking registration or other statutory protection in relation to such Developments and Company-Related Developments. A certificate in writing in favor of any third party signed by any director or officer of the Company (other than, if applicable, the Executive) that any instrument or act falls within the authority conferred by this Agreement shall be conclusive evidence that such is the case.

9.    <u>Non-Compete, Non-Solicitation and Non-Disparagement</u>.

(a)    In further consideration of the compensation to be paid to the Executive hereunder (including, but not limited to, the Base Salary, Annual Bonus and Severance Amount), the Executive acknowledges that in the course of the Executive's employment with the Company (and its predecessors) the Executive has, and will continue to, become familiar with the Company's trade secrets, methods of doing business, business plans and other valuable Confidential Information concerning the Company and its respective customers and suppliers and that the Executive's services have been and will be of special, unique and extraordinary value to the Company. The Executive agrees that, so long as the Executive is employed by the Company and continuing for twenty-four (24) months thereafter (the "<u>Restricted Period</u>"), the Executive will not, directly or indirectly, in a capacity similar to that in which Executive was employed during the twelve (12) month period preceding the termination of his employment (whether on the Executive's own account, or as an owner, operator, manager, consultant, officer, director, employee, independent contractor, investor, agent or otherwise), anywhere in the world, engage, directly or indirectly, in the Business or any business that competes directly or indirectly with the Business, or own any interest in, manage, control, provide financing to, participate in (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), or consult with or render services for any Person that is engaged in the Business or in any business that competes directly or indirectly with the Business; <u>provided, however</u>, that nothing contained herein shall prohibit the Executive from passive ownership of less than 2% of the outstanding stock of any publicly traded company or corporation, so long as the Executive (x) is not a controlling Person of, or a member of a group which controls, such entity, and (y) is not an employee, officer, manager, director, or consultant of such entity.

(b)    The Executive agrees that, during the Restricted Period, the Executive will not, directly or indirectly, in any manner (whether on his own account, as an owner, operator, manager, consultant, officer, director, employee, investor, agent or otherwise), (i) call upon, solicit or provide services to any Customer (as defined in <u>Section 12</u>) with the intent of selling or attempting to sell any products or services similar to those offered by the Business, (ii) hire or engage or recruit, or induce or attempt to induce, any employee, consultant or independent contractor of the Company or any of its subsidiaries or affiliates to leave such employment or

engagement, or (iii) in any way interfere with the relationship between the Company and any employee, consultant, independent contractor, customer, sales representative, broker, supplier, licensee or other business relation (or any prospective customer, supplier, licensee or other business relationship) of the Company (including by making any negative or disparaging statements or communications regarding the Company, or any of its operations, officers, directors or investors). Notwithstanding the foregoing, nothing contained herein shall prohibit the Executive from: (A) conducting general searches, advertising and solicitations that are not directed or targeted specifically at any employees or consultants of the Company or its affiliates (provided, however, that this sentence remains subject to the non-hire restriction set forth in Section 9(b)(ii)); or (B) engaging any employee, consultant or independent contractor whose relationship with the Company was terminated at least nine months prior to being so hired or engaged.

(c)     The Executive agrees that the Executive will not, whether during or after the Executive's employment with the Company, make any statement, orally or in writing, regardless of whether such statement is truthful, nor take any action, that (i) in any way could disparage the Company (or any principals, officers, executives, directors, partners, or managers of the Company), or that foreseeably could harm the reputation or goodwill of any of those persons or entities, or (ii) in any way, directly or indirectly, could knowingly cause or encourage or condone the making of such statements or the taking of such actions by anyone else. Nothing herein shall be deemed to preclude the Executive from (A) testifying truthfully if he is required or compelled by law to testify in any judicial action or before any government authority or agency, (B) making any other legally-required truthful statements or disclosures, (C) disclosing information about unlawful acts in the workplace, including, but not limited to, discrimination or harassment, (D) exercising his rights under the National Labor Relations Act, including, but not limited to, the right to make good faith reports to government agencies about suspected violations of the law, or (E) conducting internal Company performance reviews or providing feedback to any principals, officers, executives, directors, partners, managers, members, employees, representatives, agents, or investors of the Company in connection with Executive's employment with the Company.

(d)     The Executive acknowledges and agrees that the amounts payable by the Company under this Agreement (including, but not limited to, the Base Salary, Annual Bonus and Severance Amount) form adequate consideration for the Executive to agree to the restrictions contained in this Section 9.

(e)     The Executive further acknowledges and agrees that the restrictions contained in this Section 9 with respect to time, geographical area, and scope of activity reflect a good faith effort to impose reasonable restrictions no greater than required to protect the goodwill and other legitimate business interests of the Company, and do not impose an undue burden on the Executive. In particular, the Executive agrees and acknowledges that the Company and its subsidiaries and affiliates are currently engaging in business and actively marketing their services and products throughout the United States, and expend significant time and effort developing and protecting the confidentiality of their methods of doing business, customer lists, long term customer relationships and trade secrets and such methods, customer lists, customer relationships and trade secrets have significant value. However, if, at the time of enforcement of this Section 9, a court of competent jurisdiction holds that any restrictions stated herein are unenforceable by reason of excessive scope as to geographic, temporal or functional coverage, the Parties agree that such provision will be interpreted and modified to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable, in all cases giving effect to the

intent of the Parties that the restrictions contained herein be given effect to the broadest extent possible. **The Company advises the Executive to consult with an attorney before entering into the restrictive covenants set forth in this Agreement, and will provide the Executive with fourteen (14) calendar days to do so. By signing this Agreement, the Executive acknowledges that advice and affirms that the Company has provided the Executive with fourteen (14) calendar days to review this covenant.** Provided that, if applicable, the Company complies with its obligation to pay the Severance Amount in accordance with Section 5(c) hereof, the existence of any claim or cause of action by the Executive against the Company, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by the Company of the provisions of Sections 6, 7, 8 or this Section 9, which sections will be enforceable notwithstanding the existence of any breach by the Company (other than a breach by the Company of its obligation to pay the Severance Amount in accordance with Section 5(c) hereof, if applicable). Notwithstanding the foregoing, the Executive will not be prohibited from pursuing such claims or causes of action against the Company. The Executive consents to the Company notifying any future employer of the Executive of the Executive's obligations under Sections 6, 7, and 8 and this Section 9.

(f)     The Company maintains that the Executive's failure to perform any of the covenants in Section 6, 7, or 8 or this Section 9 would cause irreparable injury to the Company for which damages may not be an adequate remedy or cause damages to the Company that would be difficult or impossible to ascertain or quantify. In the event of the breach or a threatened breach by the Executive of any of the provisions of Section 6, 7, or 8 or this Section 9, the Company, in addition and supplementary to any other rights and remedies existing in its favor, will be entitled to seek specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security and without showing or proving any actual damage to the Company). In addition, in the event of an alleged breach or violation by the Executive of this Section 9, the Restricted Period will be lengthened by a time period equal to the period between the date of the breach of the terms or covenants contained in this Agreement and the date on which the decision disposing of the issues upon the merits shall become final or not subject to further appeal.

(g)     If the Company or the Executive (i) brings any action or proceeding to enforce any provision of this Agreement or to obtain damages as a result of a breach of this Agreement or to enjoin any breach of this Agreement and (ii) prevails in such action or proceeding, then the non-prevailing Party will, in addition to any other rights and remedies available, reimburse the prevailing Party for any and all reasonable costs and expenses (including attorneys' fees) incurred by the prevailing Party in connection with such action or proceeding.

10.     <u>The Executive's Representations</u>. The Executive hereby represents and warrants to the Company that (i) the Executive has entered into this Agreement of the Executive's own free will for no consideration other than as referred to herein, (ii) the execution, delivery and performance of this Agreement by the Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Executive is a party or by which the Executive is bound, (iii) the Executive is not a party to or bound by any employment, non-competition, confidentiality or other similar agreement with any other Person and (iv) upon the execution and delivery of this Agreement by the Company, this Agreement will be the valid and binding obligation of the Executive, enforceable in accordance with its terms. The Executive hereby acknowledges and represents that the Executive has

consulted with independent legal counsel regarding the Executive's rights and obligations under this Agreement and that the Executive fully understands the terms and conditions contained herein.

11.     409A Compliance.  To the extent any amounts payable hereunder are deferred compensation within the meaning of Section 409A of the Internal Revenue Code and applicable guidance issued thereunder ("Section 409A"), it is intended that the terms of this Agreement shall be applied consistent with the requirements of Section 409A.  If any amounts payable under this Agreement would be subject to any penalty tax by reason of the application of Section 409A, the Company will use commercially reasonable efforts to take such reasonable steps as it may determine to be necessary or desirable, with the Executive's consent, to ensure that such amounts are not subject to such penalty tax.  **However, any such tax under Section 409A is ultimately the Executive's responsibility.  The Executive is advised to seek tax advice and agrees to assume such personal tax liability as may be incurred under this Agreement.**

12.     Definitions.

"Business" means (a) asset management or community platform for the sports card, collectibles and/or memorabilia industries and (b) any other actual or documented, intended business of the Company and its subsidiaries and affiliates (pursuant to any written proposal or plan initiated, adopted or implemented by the Company or its subsidiaries or affiliates and of which the Executive has been informed, or had knowledge, of prior to the date the Executive's employment hereunder terminates and which proposal or plan has not otherwise been definitively abandoned as at the date the Executive's employment terminates) during the Employment Period and as of the date the Executive's employment with the Company terminates.

"Customer" means any Person who (a) (i) purchased products or services from the Company (or its predecessors) as of the date the Executive's employment with the Company terminates, or (ii) was a distributor, sales representative, agent or broker for the Company (or its predecessors) as of the date the Executive's employment with the Company terminates; and (b) with whom Executive had business dealings or about which Executive had access to Confidential Information.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability company or partnership, proprietorship, other business organization, trust, union, association or governmental or regulatory entities, department, agency or authority.

13.     Survival.  The provisions of this Agreement shall survive the termination of the Employment Period and/or the termination of the Executive's employment with the Company to the extent necessary to effectuate the terms contained herein.

14.     Notices.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail, on the date of transmission to such recipient, (c) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid) or (d) four business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and in each case addressed to the intended recipient as set forth below:

-11-

Notices to the Executive:

50 Main St., Suite 1410
White Plains, NY 10606
Email: krish@getnoxx.com

Notices to the Company:

222 Sedwick Road
Durham, NC 27608
Attention: Justin Holbrook and Julie Robinson
Email: jholbrook@globalgrowth.com; Jrobinson@entrustglobalgroup.com

or such other address or email or to the attention of such other person as the recipient Party will have specified by prior written notice to the sending Party.

15.    Severability.   Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any action in any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

16.    Complete Agreement. This Agreement embodies the complete agreement and understanding among the parties hereto and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. Executive hereby releases and waives any claims or rights the Executive may have under any other prior agreement or understanding the Executive may have with the or its predecessors, including, but not limited to, any claim for severance or other benefits. For the avoidance of doubt, any prior employment agreement between the Company and the Executive, on the other hand, is hereby terminated.

17.    Counterparts. This Agreement may be executed in separate counterparts (including by facsimile and electronic signature pages), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

18.    No Strict Construction.   The Parties, each represented by counsel, jointly participated in the negotiation and drafting of this Agreement.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their collective mutual intent, this Agreement will be construed as if drafted jointly by the Parties, and no rule of strict construction will be applied against any Person.  References in this Agreement to Sections shall, unless otherwise specified in this Agreement, refer to Sections of this Agreement.

19.    Successors and Assigns.   This Agreement is intended to bind and inure to the benefit of and be enforceable by the Executive and the Company and their respective heirs, successors and assigns.  The Executive may not assign the Executive's rights or delegate the Executive's duties or obligations hereunder without the prior written consent of the Company. The Company may assign its rights and obligations hereunder, with notice to the Executive, to any

affiliates of the Company or to any Person that acquires the Company or any portion of its business or its assets, in which case all references to the Company will refer to such assignee.

20.     Choice of Law; Exclusive Venue.  This Agreement shall be governed by the internal law of the State of Texas, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Texas.  The Parties agree that all Actions arising out of or based upon this Agreement or the subject matter hereof shall be brought and maintained exclusively in the State of Texas or any federal court located in the State of Texas (collectively, the "Designated Courts").  Each of the Parties by execution hereof (a) hereby irrevocably submits to the jurisdiction of the Designated Courts as set forth above in the immediately preceding sentence for the purpose of any Actions arising out of or based upon this Agreement or the subject matter hereof and (b) hereby irrevocably waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such Actions, any claim that such person is not subject personally to the jurisdiction of the Designated Courts, Each of the Parties hereby irrevocably consents to service of process in any such Actions in any manner permitted by the laws of the State of Texas and irrevocably agrees that service of process by registered or certified mail, return receipt requested, at the address specified in or pursuant to Section 14 is reasonably calculated to give actual notice and irrevocably waives and agrees not to assert by way of motion, as a defense or otherwise, in any such Actions any claim that service of process made in accordance with Section 14 does not constitute good and sufficient service of process. The provisions of this Section 20 shall not restrict the ability of any Party to enforce in any court any judgment obtained in the Designated Courts and as described in this Section 20.

21.     Business Days.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the state in which the Company's chief executive office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

22.     Withholding.  The Company will be entitled to deduct or withhold from any amounts owing to the Executive any taxes as may be required under applicable laws ("Taxes") imposed with respect to the Executive's compensation or other payments from the Company.  In the event the Company does not make such deductions or withholdings, the Executive will indemnify and hold harmless the Company for any amounts paid or payable with respect to any such Taxes.

23.     Corporate Opportunities.  During the Employment Period, the Executive will not, directly or indirectly, pursue or execute on any business, commercial or investment opportunities presented to the Executive or which the Executive becomes aware during the Employment Period which relate to the Business.

24.     Assistance in Proceedings.  During and after the Executive's employment with the Company, the Executive shall cooperate fully with the Company (a) in the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company which relate to events or occurrences that transpired while the Executive was employed by the Company, and (b) in connection with any investigation or review of any federal, state or local regulatory authority, or internal investigation by the Company, in each case as any such investigation or review relates to events or occurrences that transpired while the Executive was employed by the Company. The Executive's full cooperation in connection with

-13-

such claims, actions and investigations shall include, but not be limited to: (i) being available to the Company upon reasonable notice, at mutually convenient times, to meet with counsel for interviews and factual investigations and/or to prepare for discovery or trial; (ii) appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process; and (iii) volunteering to the Company all pertinent information and turning over to the Company all relevant documents which are or may come into the Executive's possession. The Executive's obligations under this Section 24 shall (x) be subject to Executive's reasonable availability if the Company no longer employs the Executive and (y) not unreasonably interfere with Executive's subsequent employment or his efforts to obtain such employment. The Company shall reimburse the Executive for any reasonable out-of-pocket expenses incurred in connection with the Executive's performance of obligations pursuant to this Section 24.

25.    Amendment and Waiver. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and the Executive or by a court of competent jurisdiction as the Parties provide in Section 9(e), and no course of conduct or course of dealing or failure or delay by either Party in enforcing or exercising any of the provisions of this Agreement will affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any provision of this Agreement.

*    *    *    *    *

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties hereto have each executed this Executive Employment Agreement as of the date first written above.

**BECKETT COLLECTIBLES, LLC**

DocuSigned by:

Justin Holbrook

FF1484402E4F420...

By: _____

Name: Justin Holbrook
Title: Chief Executive Officer

**KRISH DASGUPTA**

_____

- 15 -

DocuSign Envelope ID: 64813BD3-CC4E-4049-B38E-C5996C476CA5

**IN WITNESS WHEREOF**, the Parties hereto have each executed this Executive Employment Agreement as of the date first written above.

**BECKETT COLLECTIBLES, LLC**

By:_____

Name:

Title:

**KRISH DASGUPTA**

DocuSigned by:

*krish Dasgupta*

867E5D200972440F...

- 15 -

Milestones

**Phase I: Align on Beckett Technical Processes and Interface Requirements (1 month target completion date)**

1. Adopt and maintain Beckett SOPs regarding, at minimum:
    a. Development operations, to include at least:
        i. Version control
        ii. Continuous integration / continuous development
    b. Technical management
        i. Code review
        ii. Security review
        iii. Automated code assessment
        iv. Structured interface and architecture design
    c. Automated and manual testing
        i. Unit testing
        ii. Integration testing
        iii. User experience research
        iv. User acceptance testing
        v. A/B testing and hypothesis driven development

**Phase II: Search Customer Experience Launch (2 months target completion date)**

1. In collaboration with Beckett Product staff / leadership and the Rainfall agency, design and architect a new consumer-facing Search experience to meet Beckett's strategic business goals. Requirements include at least:
    a. Searching against the Beckett Palantir data layer;
    b. Merging the NoXX data into Palantir;
    c. Providing a filterable and sortable search experience along metrics that matter to target consumers based on customer research;
    d. Terminating the search experience with a rich item detail page based on the NoXX design and including comprehensive and detailed relevant information from Beckett's data.

2. Implement the new Search experience at scale and deploy it to Beckett's end Consumers.
    a. Include customer analytics.

3. Test and improve the new Search experience based on customer analytics, system logs, customer research, and Beckett Product division feedback.

**Phase III: Organize / Collect Gradual Rollout (6 months target completion date)**

1. In collaboration with Beckett Product and Design staff / leadership, triage existing NoXX functionality and use user research and real-life testing to select the optimal feature set

to drive user retention within the NoXX/Beckett Organize / Collect platform.
Requirements include at least:

> a. Transitioning selected functionality from NoXX to use the Beckett data layer (Palantir) backend;
>
> b. Amending the Ruby middleware layer as needed;
>
> c. Revamping the visual and technical design of the front-end to follow and track the Beckett design system and technical standards as defined by the Beckett Design and Artemis teams;
>
> d. Providing a compelling collecting, organizing, and showcase experience which is successful along metrics that matter to target consumers based on customer research, particularly industry standard engagement metrics such as retention over time, frequency of use, average time of use, number of actions taken on the platform, etc.

2. Implement the new Organize / Collect experience at scale and deploy it to Beckett's end consumers in a staged fashion. This includes:

> a. Importing Beckett user accounts and transitioning users' existing collections over to the NoXX-team-developed Organize / Collect experience;
>
> b. Moving the core business logic and data processing code into Palantir to feed the Ruby middleware layer with needed data;
>
> c. Replicating or exceeding an agreed-upon subset of functionality from the existing Beckett Collect / Organize products, including multi-condition pricing (this may include creating data processing code or connections within Palantir to power this functionality);
>
> d. Staging the transition appropriately to maintain strong performance metrics throughout the rollout;
>
> e. Instrumenting the product with robust analytics and logging to measure success on technical and user experience metrics;
>
> f. Fixing bugs and issues based on user reports, logs, and user research;

3. Test and improve the new Organize / Collect experience based on customer analytics, system logs, customer research, and Beckett Product and Design division feedback.

**Phase IV: Organize / Collect Growth and Indirect Revenue Generation; Trade Prototype (7 months target completion date)**

1. Build up the Organize / Collect product suite to full saturation of all existing Beckett users plus help drive user growth. Improve the platform according to rigorous user research, driving improvement of user growth and retention Key Performance Indicators (KPIs).

2. Design, Build and deploy at scale Trade functionality (consumer-to-consumer) within the platform.

3. Test, validate, instrument, and improve the system using Beckett SOPs.

**Phase V: Marketplace + Trade Customer and Dealer Experience (8 months target completion date)**

1. Design, Build and deploy at scale a business-to-consumer (Marketplace) capability within the Trade / Organize product.

2. Stage over all or materially all existing dealer customers of Beckett Marketplace (and their account data) into the new system and help drive dealer user growth.

3. Test, validate, instrument, and improve the system using Beckett SOPs.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rebecca Baird on behalf of W. Masterson
Bar No. 13184000
rlb@kilgorelaw.com
Envelope ID: 78485539
Filing Code Description: Plaintiff's Original Petition (OCA)
Filing Description: Plaintiff's Original Petition
Status as of 8/14/2023 10:40 AM CST

Associated Case Party: Krishnendu Dasgupta

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Bill Masterson | | wdm@kilgorelaw.com | 8/14/2023 10:22:33 AM | SENT |
| Rebecca LeGrand | | rlb@kilgorelaw.com | 8/14/2023 10:22:33 AM | SENT |